## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

CHRIS O'HARE,

     Plaintiff,

vs.

TOWN OF GULF STREAM;
TOWN OF GULF STREAM COMMISSION;
TOWN MANAGER WILLIAM THRASHER, Town Manager, in his individual capacity and official capacity as the Town manager for the Town of Gulf Stream;
TOWN SPECIAL MAGISTRATE LARA DONLON, Special Magistrate, in her individual capacity and official capacity as a Special Magistrate for the Town of Gulf Stream;
OFFICER DAVID GINSBERG, Officer, in his individual capacity and official capacity as an Officer for the Town of Gulf Stream;
SERGEANT ADAM GOREL, Sergeant, in his individual capacity and official capacity as an Sergeant for the Town of Gulf Stream;
STEVEN TOBIAS, Building Official, in his individual capacity and official capacity as a Building Official for the City of Delray Beach; and
MARTY MINOR, Planning Consultant, in his individual capacity and official capacity as a Planning Consultant for the Town of Gulf Stream.

     Defendants.

_____/

### COMPLAINT FOR LEGAL DAMAGES AND OTHER RELIEF

COMES NOW, Plaintiff, CHRIS O'HARE by and through his undersigned counsel and hereby sues Defendants, the TOWN OF GULF STREAM, TOWN OF GULF STREAM COMMISSION, TOWN MANAGER WILLIAM THRASHER, TOWN SPECIAL MAGISTRATE LARA DONLON, OFFICER DAVID GINSBERG, SERGEANT ADAM GOREL, STEVEN TOBIAS and MARTY MINOR and alleges:

## INTRODUCTION

Plaintiff, Chris O'Hare, brings this action to recover monetary damages from the Defendants for violating Plaintiff's civil rights.  Beginning in September of 2011, O'Hare's unfriendly encounter with Ginsberg set off a chain of events that led to the Town of Gulf Stream and some of its employees retaliating against O'Hare in numerous ways to punish O'Hare for his insolence in demanding equal treatment under the law.  In doing so, the Town has (a) enforced unconstitutionally vague laws, and parts of the Town Code which give no notice that they carry the force of law, (b) prosecuted O'Hare without giving any notice as to what facts and law would be in question beforehand, and (c) required O'Hare to remedy supposed violations under the Town Code, utilizing unconstitutionally vague standards.  Indeed, the Town and its named Defendants agents have acted upon their invidious animus and utilized vague and unnoticed standards to carry out their retribution.  O'Hare has suffered dearly, both economically and emotionally.

## JURISDICTION AND VENUE

1. **O'Hare brings this action under 18 U.S.C. 1983, Florida common law and F.S.S. 768.28.**

2. **This Court has jurisdiction under 28 U.S.C. 1331, which gives district courts original jurisdiction over civil actions arising under the Constitutional laws or treaties of the United States.**

3. **This Court has jurisdiction under 28 U.S.C 1443(2), which gives district courts jurisdiction over actions to secure civil rights extended by the United States government.**

2

4. **This Court has jurisdiction under 28 U.S.C. 1367, which gives the district court supplemental jurisdiction over state law claims.**

5. **Venue is appropriate in this judicial district under 28 U.S.C. 1391(b) because the events that gave rise to this complaint occurred in this district.**

## PARTIES

6. Plaintiff, Christopher O'Hare ("O'Hare") is now and at all times pertinent was a resident of the Town of Gulf Stream, Palm Beach County, Florida which is located in the United States, Southern District of Florida.

7. Defendant, Town of Gulf Stream ("Town") is a Florida municipality duly formed and operating under the laws of the State of Florida and the United States of America.

8. Defendant, David Ginsberg ("Ginsberg") was a Zoning Enforcement Officer for the Town and an active member of the Town's municipal police force during all times relevant.

9. Defendant, Adam Gorel ("Gorel") was a Sergeant for the Town and an active member of the municipal police force during all times relevant.

10. Defendant, Town Manager William Thrasher ("Thrasher"), was at all times pertinent, the Gulf Stream Town Administrator with authority over the actions of Ginsberg, Gorel, Minor and the Town.

11. Defendant Magistrate Lara Donlon ("Donlon"), was at all times pertinent, (presenting herself or acting as) the Gulf Stream Town Special Magistrate who presided over Code Enforcement Hearings.

12. Defendant Marty Minor ("Minor"), was at all times pertinent, the Town's Planning Consultant.

**13.** Defendant, Town of Gulf Stream Commission ("Commission") is the Commission duly formed and operating under and for the Town, a Florida municipality operating under the laws of the State of Florida and the United States of America.

**14.** Defendant, Steven Tobias ("Tobias") is a Building Official for the City of Delray Beach, which is under an interlocal agreement to provide building inspection services.

### GENERAL ALLEGATIONS (a-e)

#### (a) Officer Ginsberg's Illegal Search and Seizure Under the Fourth and Fourteenth Amendments

**15.** Starting on or about August, 2011, O'Hare chose to perform improvements on his residence located at 2520 Avenue Au Soleil, Gulf Stream, Florida 33483 - which is located in the Place Au Soleil subdivision.

**16.** The improvements involved both interior and exterior renovations to his residence including the replacement of the existing roof.

**17.** On or about September 15, 2011, Ginsberg arrived at O'Hare's home, ordering landscaping workers to cease and desist for lack of a vendor registration decal on the workers' commercial vehicle.  When O'Hare asked Ginsberg if the workers could continue while someone went to Town Hall to obtain said decal, Ginsberg refused and stated that he felt compelled to "act tough" with these "beaners" or they would never comply with the Town's rules.

**18.** Upon hearing such blatant racist remarks from Ginsberg, O'Hare replied with moral disapproval, "This is just great, I got a racist and a Barney Fife protecting my family."

**19.** Ginsberg then became agitated and shook his finger at O'Hare, whereupon Ginsberg retorted that O'Hare should be grateful that when the new Wal-Mart opened (on the west side of Federal Highway and across from the entry to the Place Au Soleil

subdivision), that he, Ginsberg, would be keeping the trash out the neighborhood - referring ostensibly to the non-white people of color, ethnicity, or national origin who would supposedly be attracted to the new Wal-Mart store.

**20.** On or about October 28, 2011, Ginsberg, acting in his official capacity under the color of municipal law, entered the curtilage of O'Hare's property and inside O'Hare's house with neither consent nor warrant, all the while, dawning a police officer's pistol.

**21.** Prior to entering the curtilage of O'Hare's home, Ginsberg asked Vincent Gonzales ("Gonzales"), a lawn maintenance worker, who was immediately adjacent to the gate surrounding O'Hare's curtilage; Gonzales responded - "only workers."

**22.** Ginsberg then proceeded through a self-closing gate into the curtilage of O'Hare's residence, speaking to no person(s), past several Spanish speaking minority painters, working on the house.

**23.** There was no apparent cause and/or justification; Ginsberg's intentions were totally unknown at the time.

**24.** Having breached O'Hare's curtilage, but before entering O'Hare's house, again with neither consent nor a warrant, Ginsberg made contact with the only Caucasian construction worker, John Gundlach ("Gundlach").

**25.** When Gundlach became aware of Ginsberg's presence, and seeing that Ginsberg was bearing a firearm, Gundlach inquired about Ginsberg's identity and intentions.

**26.** Ginsberg said he wanted to enter the home. Gundlach refused Ginsberg's request and warned him that Gundlach did not have authority to allow Ginsberg's entry.

27. Ginsberg, saying nothing further and without presenting any official credentials whatsoever, proceeded to open O'Hare's rear porch door and walked into O'Hare's home over the continued verbal objections of Gundlach.

28. As he entered O'Hare's home, Ginsberg finally replied to Gundlach's objections by stating -  "I am a police officer.  I can go anywhere I want."

29. While standing in the middle of O'Hare's home, Ginsberg consulted with Thrasher via Ginsberg's cell phone.

30. After Ginsberg finished his call with Thrasher, Gundlach informed Ginsberg that he had spoken with O'Hare and that O'Hare wanted the officer to leave the home.

31. Ginsberg replied forcefully - "You're the one who has to leave!" and exclaimed - "I want you all to stop working and leave right now!"

32. Gundlach then informed all of the workers of Ginsberg's cease and desist order.

33. Immediately upon leaving, Ginsberg drove his town-owned vehicle around the corner to the property at 2516 Avenue Au Soleil, located adjacent to O'Hare's home at 2520 Avenue Au Soleil, and owned by O'Hare. Once there, Ginsberg proceeded to walk past the same maintenance worker, Gonzales, through another self-closing gate, and entered the curtilage of O'Hare's property. Ginsberg then reached over a six foot high solid wood fence and photographed the curtilage and those portions of O'Hare's home located at 2520 Avenue Au Soleil, not visible to the public, including the interior of O'Hare's home as seen through the rear porch of O'Hare's private backyard.

34. Ginsberg departed O'Hare's home and returned a short time later, accompanied by Steve Tobias, a Building Official for the City of Delray Beach, which is under contract with the Town to provide building inspection services for the Town.  Ginsberg and

Tobias attempted to gain entry to the interior of O'Hare's home at the front entry door and the side garage door; but found both doors locked. Ginsberg then proceeded to take additional pictures of the rear of O'Hare's home and adjacent curtilage area by positioning his camera over the top of the six foot high fence which encloses the curtilage of O'Hare's home.

35. While Ginsberg stated in his subsequent police report regarding this incident that he was suspicious of "banging noises" at O'Hare's residence due to two recent burglaries of "unoccupied houses" in the Town, Town Attorney John Randolph subsequently revealed that Ginsberg said he really entered O'Hare's home unannounced to check the immigration status of the workers therein.

36. On or about March 5, 2012, Ginsberg repeatedly slammed on O'Hare's door. After Gundlach answered the door, Ginsberg proceeded to disparage O'Hare, ending his tirade by stating that the Town - "had Mr. O'Hare's number."

37. On or about March 5, 2012, Ginsberg stood in that part of the street that faces the front of O'Hare's home and proceeded to stare down O'Hare, who was standing in his front yard, in an outrageous and menacing fashion so as to cause O'Hare to be concerned for his safety.

38. On March 20, 2012, O'Hare pulled into his driveway at 2516 Avenue Au Soleil with a large trailer in order to unload some boxes, etc. into his garage. Due to the size of the trailer, O'Hare had to park across his driveway and partly on his lawn. Ginsberg pulled up behind O'Hare's trailer, parked his patrol car facing O'Hare, got out of his car and walked to the rear of the trailer, stopped and stared at O'Hare for a few minutes without speaking. Ginsberg inexplicably returned to his patrol car and moved it

forward facing away from O'Hare. Ginsberg again got out of his patrol car and approached O'Hare and inquired of Mr. O'Hare as to how long he planned to have the trailer parked there. O'Hare explained that he was just unloading a few items and would be leaving in few minutes. Ginsberg then left.

39. Later in 2012, O'Hare learned from other Town residents that the Town police systematically execute illegal searches by routinely entering the curtilage of residents' homes without consent, authority or cause.

40. On or about October 11, 2013, O'Hare learned that another resident of the Town, Martin O'Boyle, was contacted by Gorel, acting as a zoning officer, to let Mr. O'Boyle know that two painters were working at his house without a Town work permit. Mr. O'Boyle asked Gorel if he could get work permits at a later date and if Gorel could allow the workers to continue. Mr. O'Boyle then went on to ask Gorel if it would be "cool" to take this one up with Town Clerk Rita sometime next week. Gorel replied accommodatingly that they ("the police") do whatever "Town Hall" says and chose to delay enforcement indefinitely until hearing from "Town Hall."

### (b) Metal Roof

41. Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 40.

42. On or about August 29, 2011, O'Hare submitted a "ROOF/RE-ROOF PERMIT APPLICATION" to the Town for a replacement roof of his single-family home, for which he was already in the course of improving.

43. The Re-Roofing Permit was issued on or about the day it was applied for with the sole condition that work commence within 180 days or else it would expire.

**44.** After the existing roof was removed, O'Hare became suspicious that the home's structure was not strong enough to support the appropriate replacement – a white colored concrete flat tile roof which was deemed appropriate in design and character for the Place Au Soleil district.

**45.** On or about October 26, 2011, O'Hare contacted his roofer to let him know he was concerned about the structural integrity of his roof and would be seeking to change the roof covering materials on his residence from concrete tile to metal - because a metal roof was patently lighter than concrete tile.

**46.** On or about November 3, 2011, John Mulleavey of Roof Tec, e-mailed O'Hare that, while attending a Roofing Association Meeting the previous evening, he discussed "with another long-time roofing contractor in our area" that O'Hare was considering a metal roof, and was told by the contractor - "that it doesn't matter what system we use, THE TOWN OF GULFSTREAM DOES NOT ALLOW METAL ROOFS OF ANY KIND."

**47.** On or about November 15, 2011, O'Hare's roofer submitted an application on O'Hare's behalf for a metal roof permit in the same white color as the previously approved roof.

**48.** Thrasher, acting in his capacity as Administrator, rejected O'Hare's request to change the roof materials to metal.  Mulleavey informs O'Hare by e-mail that - "We submitted the permit revision today and was rejected by Bill Thrasher with a simple and stern "No Metal Roofs PERIOD."

**49.** However, Thrasher failed to inform O'Hare there was a metal roof exception clause under Section 70-187(2) of the Town Code, the Gulf Stream Design Manual - which,

in fact, authorizes metal roofs on single-family residences under certain circumstances. Although Article V, section 70-99(3) and Article VI, section 70-187(2) generally state that all metal roofs are prohibited, Article VI, section 70-187(2) includes an exception which reads, in pertinent part:

> Certain metal roofs determined by the town to be appropriate to the structure and to the neighborhood may be approved only in instances of re-roofing of existing structures based upon an engineer's certification that the existing structure will not support a tile roof.  Additionally, unpainted copper may be used either as a decorative accent or on minor accessory structures.

50. On or about December 13, 2011, O'Hare had a certified engineer, Terrence E. Lunn. PE, inspect the house's roof framing.

51. The next day, December 14, 2011, engineer Lunn informs O'Hare that his roof will not support the type of concrete tile required by the Town and issued O'Hare a certified letter as to same.

52. On or about March 6, 2012, after engineer Lunn certified that O'Hare's home could not support a concrete tile roof thereby entitling O'Hare to the benefit of a metal roof under Section 70-187(2) of the Gulf Stream Design Manual, Thrasher, in a letter to O'Hare, refused to acknowledge the metal roof entitlement as a matter of policy, and informed O'Hare that metal roofs were prohibited and should he want a metal roof, O'Hare needs to apply for a variance.  Thrasher also informed O'Hare that the variance process would require an inspection of the property by the Town's engineer in order to verify the conclusions reached by Lunn and the veracity of Lunn's certification letter.

53. On or about March 28, 2012, O'Hare, relying upon the provisions of Sec. 70-187(2) of the Town Code, filed an appeal of Thrasher's March 6, 2012 decision in which he stated that a variance would be required for a metal roof.

54. On or about March 30, 2012, the Town through Clerk Rita Taylor and Thrasher, requested that the Town Engineer be allowed to verify O'Hare's engineer's Letter of Certification.  Since verification was not required to meet the exception of Section 70-187(2), O'Hare refused.

55. On or about April 13, 2012, at a Hearing of the Town Commission sitting as the Board of Adjustment to consider O'Hare's appeal, Thrasher stated that he knew of conflicts regarding metal roofs in Article V and Article VI, but felt the more restrictive Article V was controlling. Thrasher took this position despite the fact that Article VI, section 70-186(b) of the Town Code states that where portions of Article VI may conflict with portions of Article V, Article VI shall prevail - thus making the exception to a metal roof as outlined in Section 70-187(2) the exception that supersedes the rule.

56. Town Clerk Rita Taylor stated that she had spoken to Diana, as secretary at RoofTec, the roofer who had worked on O'Hare residence, and Diana said that O'Hare "just wanted a metal roof."

57. Thrasher stated that O'Hare wanted a metal roof and further stated that O'Hare even asked the Town for a metal roof before conducting a structural analysis.

58. Town Attorney John Randolph said that if O'Hare could let the Town verify the basis for Engineer Lunn's certification, then O'Hare would be entitled to a metal roof and that a variance would not be required.

59. However, at the May 11, 2012 Board of Adjustment hearing, a continuation of the April 13, 2012 hearing, the Town Commission and Town Attorney John Randolph stated that despite what the Town Code said, the Town ought to be able to review engineer Lunn's certification for veracity.

60. Then Vice Mayor Joan Orthwein stated that a variance was required because of questions surrounding Engineer Lunn's report; and also stated that because the roof had held concrete tiles for the last 35 years, the Board had a right to question the integrity of the engineer's certification.

61. Commissioner Devitt, sitting on the Board, said that the metal roof would be a "done deal" if the town could verify the engineer's certification.

62. Commissioner Dering, sitting on the Board, said that the issue of whether O'Hare was entitled to a metal roof or required a variance would become "quite clear" upon allowing the Town's Engineer to inspect O'Hare's home and verify Engineer Lunn's certification.

63. Also during the May 11, 2012 Board of Adjustment hearing, Town Attorney Randolph conceded that O'Hare had done everything required of him to qualify for the exception allowing a metal roof under Town Code Section 70-187(2), and further no variance was required for O'Hare's metal roof; but because O'Hare would not let the Town independently verify engineer Lunn's certification by an engineer of the Town's choosing, O'Hare would need to apply for a variance.

64. O'Hare was never given any notice that the April 13, 2012, Board of Adjustment Hearing would address the factual veracity of Engineer Lunn's certification and as such was not given a meaningful opportunity to prepare arguments of law and present factual evidence to address the Board's concern.  Rather, O'Hare was only noticed that the Board would address whether Thrasher was wrong to require a variance in order for O'Hare to have a metal roof permit as a matter of law.

65. Many times during both the April 13, 2012 and May 11, 2012 Board of Adjustment Hearings, O'Hare's counsel, Mr. Roeder, asked the Board what part of the Town's Code specifically provides for a variance from the regulations of Chapter 70, including 70-187(2), and further asked the Board where such a provision could be found. The Board did not respond to either inquiry.

66. After the Board of Adjustment hearing on May 30, 2012, the Town Commissioners issued a Final Action sustaining Thrasher's denial of a metal roof without first obtaining a variance.

67. On July 13, 2012, just two months after the final action by the Commission in the Appeal before the Board of Adjustment, the Commission changed Sec 70-187(2) of the Code with the adoption of Ordinance 12/4, to mandate engineer's certifications be presented with studies/reports and a provision giving the Town the discretion to inspect the applicants home with their own engineer - precisely the conditions they placed upon O'Hare at the previous appeal hearings without any notice.

68. On or about June 18, 2012, O'Hare filed a petition for Certiorari before the 15th Judicial Circuit Court of Florida challenging the Commission's final action on Thrasher's decision. The Town's response to this petition included their assertions that the use of the word "may" as it appears in the Town Code would mean "may or may not" and the choice of which meaning applied was at the sole discretion of the Town.

69. On June 28, 2012, O'Hare also filed for an emergency writ of mandamus seeking to compel the Town to issue a permit for a metal roof because the Florida hurricane season was imminent.

70. On September 4, 2012, the writ of mandamus was denied with no opinion.

**71.** On or about January 28, 2013, the 15th Judicial Circuit ruled on O'Hare's petition for Certiorari by issuing a per curium denial.

**72.** On or about February 27, 2013, O'Hare sought appellate review of the 15th Judicial Circuit Court order before the Fourth District Court of Appeals.

**73.** On June 18, 2013, with no response from the Town, the appeal to the Fourth District Court of Appeals was denied on its merits - with no opinion.

**74.** Since October of 2011, the O'Hares have been prevented from installing a proper roof on their home and, as such, have been unable to obtain homeowners insurance. Because of the events described above, O'Hare, his wife, and his minor children have been forced to endure much consternation and severe emotional distress for which Mrs. O'Hare has sought and received medical assistance.

### (c) Illegal Seizure of Plants And O'Hare

**75.** Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 74.

**76.** On or about November 21, 2011, O'Hare was planting several small trees near the edge of his home's property, apparently within the public right of way, yet further from the edge of the road than similar and larger trees planted at several other homes within the Town's district, including the home of then current Commissioner Anderson at 960 Indigo Drive in the same Place Au Soleil subdivision. The portion of the public right-of-way where the trees were planted is the continuous landscaped zone located from the edge of the roadway pavement to the edge of his property line. The maintenance responsibility of this area has historically been that of the owner of the property immediately adjacent to the right-of-way.

77. Gorel observed O'Hare in the process of planting the trees and proceeded to converse telephonically with Thrasher in front of O'Hare.

78. Gorel thereafter ordered O'Hare to move the trees back from the edge of the road, but refused to inform O'Hare how far the plants needed to be moved back.

79. O'Hare then gets Gorel's consent to retrieve his copy of the Town Code and asks Gorel to show him where in the Code was the prohibition against O'Hare's type of plantings in the right of way.

80. Gorel declined to look in O'Hare's copy of the Town Code and retorted by telling O'Hare that - "police have their own book of rules."  After again talking on his cell phone to Thrasher, Gorel informs O'Hare that Thrasher said the plants had to be removed "or else."

81. On or about November 22, 2011, Thrasher sends Ginsberg to O'Hare's residence to photograph said plants.

82. On or about November 23, 2011, Thrasher had a letter hand-delivered to O'Hare stating that O'Hare needed a "landscaping permit prior to commencing **any** landscaping on [his] property."

83. Thrasher also informs O'Hare that the police use the same code book that O'Hare had presented to Gorel two days before.

84. On or about March 1, 2012, Lou Roeder, attorney for O'Hare, requests the Town for a cite of that portion of the code that requires a permit for "any" landscaping.

85. On or about March 6, 2012, Thrasher replied to Mr. Roeder's question and stated, in effect, "any" landscaping is what the Town Administrator, says it is.

86. In the same reply, Thrasher also stated that he was directed by the Town Commission in 2004, to prohibit planting in the right of way as a matter of policy, but could not provide a reference to any Town law.

### (d) Fraudulent Code Violations

87. Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 86.

88. On or about October 1, 2012, Thrasher sends a town employee to photograph O'Hare's landscaping at 2520 Avenue Au Soleil.

89. On or about October 5, 2012, Thrasher initiates e-mails back and forth with Board Members of the Place Au Soleil Homeowners Association, soliciting a negative reaction to O'Hare's recent plantings. Thrasher tells the HOA Board members that "if [they] are happy with [O'Hare's planting] in [their] community, then he is not going to force the issue with the O'Hares"; however, "if [they] are not happy, [they] are to advise him and he will take the appropriate action."

90. On or about October 16, 2012, Minor responds to Thrasher's request to review the landscaping at O'Hare's home.  In a subsequent memorandum, Minor reports to Thrasher that O'Hare is in violation of Town Code Sec. 70-32, 70-146, and 70-150.

91. On or about November 5, 2012, O'Hare receives a code violation letter stating that he is in violation of Town Code: (a) 58-138 for moving fill on his property without a permit, (b) 70-150 which outlines the types of plants found in the town; (c) 70-32 which summarizes the common characteristics of the Place Au Soleil district, including, as undefined, "open front lawns"; and (d) 70-146 which outlines several purposes of the landscape standards.

**92.** On or about January 28, 2013, O'Hare sends Thrasher a letter requesting clarification of the November 5, 2012 charges because O'Hare did not understand in what way he had violated the quoted sections of the Gulf Stream Design Manual. More specifically, O'Hare took issue with Thrasher's interpretation of those parts of the code which carry the force of law and those parts of the code that merely reference the history and past characteristics of the Town, and those parts that resemble an architectural reference manual intended to be used for the purpose of reviewing development proposals.

**93.** On or about February 26, 2013, Thrasher responds to O'Hare's January 28, 2013 letter not by answering his request for clarification, but by informing O'Hare of a formal Code Enforcement hearing date which had been set before Dolon.

**94.** O'Hare requested a copy of the Town's Staff Report prior to the Code Enforcement hearing but received no response.

**95.** On or about February 26, 2013, the Town informed O'Hare of a Code Enforcement hearing scheduled for March 21, 2013.

**96.** When Thrasher is asked during the hearing on cross examination to define what constitutes an "open front lawn," he replies, "I don't think that, specifically, it's defined. The fact *that you can or cannot see the front* of the home would be an indicator . . ." Thrasher continued, "At this time, *I do not know if there is a definition* in our code of open front yards. It is a general term that I have referred to and referenced whether or not you could see the front door, see the front of the house."

**97.** On or about April 2, 2013, Donlon, finds that (a) 58-128 does not apply, (b) no violation for 70-150 or 70-146, but does find (c) O'Hare in violation of the "open front

lawns" provision under 70-32(a) entitled "Summary of district [Place Au Soleil] characteristics."

98. Donlon then orders O'Hare to remove the plants in his driveway "that block the view of the home and return it to the previously existing condition." Not defining what IT is, or to what extent any plants need to be removed to open the view to the driveway, and without reference to any pre-existing date or configuration to which the landscaping would need to be reverted.

99. On or about April 19, 2013, Thrasher met O'Hare and O'Hare's employee, Rodrigo Tejera, at O'Hare's home to inspect landscaping and determine whether the property complied with Donlon's order.

100. While Thrasher acknowledged that O'Hare now met the definition of an "open front lawn" as ordered by Donlon, he insisted that O'Hare was still not in compliance because he did not return his home to its pre-existing condition.

101. Thrasher then showed O'Hare a never before-seen photo – evidently copied from Google Earth Street View, with a time stamp of May 2011, and demanded that O'Hare restore his landscaping to conform to that photo.

102. The photo was not offered into evidence during the March 21, 2012 Code Enforcement Hearing before Donlon, and was neither referenced nor presented to O'Hare prior to the April 19, 2013 meeting with Thrasher.

103. On the same day, O'Hare filed a Motion for Reconsideration before Donlon, because the findings of facts and conclusions of law were not supported by the evidence presented at the hearing by Thrasher.

104. On or about May 13, 2013, O'Hare searched the Town's public records and discovered that (1) the sworn testimony of Thrasher wherein he states (a) the town has consistently used an "open front lawns test" when enforcing landscaping provisions of the code; and (b) that all non-complying similarly situated properties were lawfully "grandfathered in" and (2) hired witness Minor's testimony that O'Hare was planting prohibited species were all directly contradicted by photographic and other evidence located in the Town's own records. These records contradicted Thrasher's unwavering definition of "open front lawns" from his own testimony at the hearing.

105. O'Hare filed a Motion for Sanctions for Fraud Upon the Court after discovering that critical evidence presented by the Town at the March 21, 2013 Code Enforcement Hearing before Donlon was intentionally false.

106. On or about May 14, 2013, O'Hare attended the Fine Assessment Hearing before Donlon, wherein Donlon refused to consider O'Hare's Motion for Reconsideration and his Motion for Sanctions in the presence of Town Attorney John Randolph.

107. Donlon also found that O'Hare had not complied with her order to remove plants from the driveway, despite the fact that removing plants from the driveway in their entirety was not specifically mandated by Donlon's April 2, 2013, Order.

108. Donlon fined O'Hare $100 dollars a day instead of $200 a day because O'Hare took remedial action and attempted to comply with Donlon's Order. Before issuing the order, Donlon appeared to recognize that the Order was vague, but nevertheless ruled for the Town to ensure that her law firm would continue serving as the Special Magistrate at the pleasure of the Town.

**109.** The same day, O'Hare removes vegetation to conform to Thrasher's photograph - at an estimated cost of $5,400.

**110.** On all relevant dates in this section, Donlon was not a duly appointed Special Magistrate pursuant to Town Code Sec. 2-67(a)–(c) and, as such, without jurisdiction.

### (e) Garage Permit - Unilateral Style Change

**111.** Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 110.

**112.** On or about September 15, 2012, O'Hare submitted a permit application to Thrasher for a hurricane-rated garage door on his residence at 2520 Avenue Au Soleil.

**113.** On or about September 18, 2012, Thrasher denies the garage door permit saying that it did not conform to the "Bermuda" Style as defined in the Town Design Manual.

**114.** Thrasher made this determination despite the fact that the Town Manual, a part of the Town Code, classifies O'Hare's home style as "Other/Various", **not** "Bermuda". Thrasher instructed Minor to find any reason to justify changing this property's zoning description as it is codified in the Town's Code therefore to provide Thrasher with a supported rational basis for this change and then, for the purpose of enforcing a design standard, not clearly defined in the Town's Code, did change the official description of this property without the benefit of a public hearing as required by the Town Code.

**115.** Because Thrasher unilaterally redefined O'Hare's home style as "Bermuda" instead of "Other/Various," O'Hare is not now entitled to improve his home in ways allowed under "Other/Various" Style but must adhere to contrary standards reserved exclusively for "Bermuda" Style.

**COUNT I**

**Illegal Search and Seizure Under the Fourth and Fourteenth Amendment**

116.  Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 115.

117.  Ginsberg entered the curtilage and home of the O'Hare family on October 28, 2011, without a warrant or exigent circumstances as either a code enforcement officer, police officer, or both, in violation of the Fourteenth Amendment Search provision.

118. The Town Code Sec. 2-26 specifically cross references Florida State procedures for obtaining inspection warrants before entering residential property.

119. Ginsberg seized O'Hare's workers without a warrant and in the course of executing an illegal search, thereby causing harm to O'Hare's right to privacy, emotional wellbeing, the loss of contractual services, and diminution in value of building materials.

120. Ginsberg entered the curtilage of the O'Hare home on October 28, 2011, without a warrant, authority or exigent circumstances as either a code enforcement officer or law enforcement officer, or both, in clear violation of the Fourteenth Amendment Search provision.

121. Ginsberg attempted to enter O'Hare's home a second time on October 28, 2011, accompanied by Tobias, without a warrant, authority or exigent circumstances as either a code enforcement officer or law enforcement officer, or both, in clear violation of the Fourteenth Amendment Search provision.

122. Additionally, the information gained from Ginsberg's illegal search was used as the basis for a Notice of Violation issued by Thrasher on October 29, 2011, and subsequently and prejudicially influenced the Town Commission when they

subsequently denied O'Hare's exemption for a metal roof without any apparent cause on May 30, 2012.

## COUNT II
## First Amendment Retaliation

**123.** Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 122.

**124.** Ginsberg retaliated against O'Hare because of O'Hare's association with non-whites.

**125.** In the alternative, Ginsberg retaliated against O'Hare because of O'Hare's critical statements and expressed moral outrage at Ginsberg's disposition towards race and displays of overt racism.

**126.** As a result of Ginsberg retaliation, Ginsberg caused harm to O'Hare's right to privacy, emotional well-being, the loss of contractual services, and diminution of value of building materials as well as the harms stated above.

## COUNT III
## Impairment of Contract Based on Race

**127.** Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 126.

**128.** Ginsberg impaired O'Hares contracts during the unlawful search on October 28, 2011 in violation of 42 U.S.C. 1981 when he ordered O'Hare's contractors/workers to cease performing their obligations based upon Ginsberg's previously-stated beliefs as to their non-white status as "beaners," thereby furthering his promise to rid the neighborhood of "trash."

**129.** This impairment of contract under color of law caused O'Hare to suffer loss of contract services, and diminution of value of building materials and labor.

**COUNT IV**
**Denial of Equal Protection Under the Fourteenth Amendment**

130. Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 129.

131. Ginsberg performed an illegal search, seizure, and otherwise acted harassingly, intruding upon O'Hare's seclusion, based upon an irrational basis that was motivated by invidious purposes - O'Hare's association with non-whites and Ginsberg's personal spite toward O'Hare.

132. In acting without a rational basis, Ginsberg caused all of the aforementioned harms in Count I through Count IV above.

**COUNT V**
**Denial of Equal Protection/Substantive Due Process Under the Fourteenth Amendment – Supervisor Liability**

133. Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 132.

134. Thrasher, the direct supervisor of Ginsberg, whom he was in constant and detailed communication concerning all code enforcement issues as well as contemporaneous telephonic contact during the search, ratified, encouraged, or otherwise acted favorably towards Ginsberg's October 28, 2011, illegal search, seizure, and other prior and subsequent acts, with deliberate indifference to O'Hare's constitutional rights which violates the civil rights as described in Counts I through IV above.

**COUNT VI**
**Denial of Equal Protection/Substantive Due Process Under the Fourteenth Amendment – Municipal Liability**

135. Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 134.

136. Thrasher, the chief executive policy enforcer of the Town and the direct supervisor of Ginsberg, in his code enforcement duties, with whom he was in constant and detailed communication concerning all code enforcement issues, ratified, encouraged, or otherwise acted favorably towards Ginsberg's October 28, 2011 illegal search, seizure, and other acts with reckless disregard to O'Hare's civil rights as described in Counts I through V, above.

137. The Town policy of allowing police/code enforcement officers to execute illegal searches without a warrant, as implemented through Thrasher, caused the harms in Count I through VI above.

138. Town adjudicated against O'Hare using a quasi-judicial process presided over by an unauthorized Special Magistrate who acted without proper authority.

<u>**COUNT VII**</u>
<u>**Trespass**</u>

139. Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 138.

140. On or about October 28, 2011, Ginsberg unlawfully and intentionally entered O'Hare's home wherein he ordered O'Hare's contractors/workers to cease work.

141. The same day, Ginsberg intentionally and unlawfully entered O'Hare's property wherein he photographed the curtilage of the O'Hare home.

142. The same day, Ginsberg returned to O'Hare's property with Tobias and intentionally, unlawfully and successfully attempted to enter O'Hare's home for a second time, and to photograph the curtilage of the O'Hare home from over a six foot high privacy fence.

**143.** These actions caused O'Hare the aforementioned harm in Count I through Count VII above.

**COUNT VIII**
**Tortuous Interference with Contract**

**144.** Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 143.

**145.** On or about October 28, 2011, Ginsberg, in the course of illegally trespassing in O'Hare's home, intentionally and illegally caused O'Hare's contractors to cease work, thereby denying them the ability to fulfill their contractual duties, and causing O'Hare to undergo delays in construction, money to pay for services not rendered and all other harms noted in Counts I through VIII above.

**COUNT IX**
**Intrusion Upon Seclusion**

**146.** Plaintiff re-alleges and re-avers each of the allegations as set forth in the above Paragraphs 1 through 145.

**147.** Ginsberg's trespass upon O'Hare's home on October 28, 2011, whereupon he photographed the curtilage, backyard, and interior of O'Hare home, and Ginsberg's return visit to again photograph O'Hare's curtilage and backyard, constituted a highly offensive intrusion upon the solitude or seclusion of O'Hare's private residential spaces thereby causing O'Hare emotional distress, insecurity, concern for the safety of his family, and loss of privacy interest in the non-public portions of his home.

## Count X
## Denial of Equal Protection

**148.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 147.

**149.** Thrasher denied O'Hare equal protection by denying O'Hare a vested property interest to a metal roof with no rational basis and/or based on invidious contempt, spite, personal taste, or other illegitimate government interest with willful disregard to the Town's Code.

**150.** As a result of the aforementioned conduct, O'Hare has been forced to endure two hurricane seasons without a properly weatherproofed roof, was unable to acquire homeowner insurance because he lacked a completed roof, and was forced to mend and repair leaks caused by storm events otherwise preventable by a proper roof. O'Hare was also caused to endure costly appeals and suffered emotional distress stemming directly from Thrasher's harassing treatment and indirectly from the anxiety, pain, and suffering of his family stemming from the adverse living conditions caused directly by Thrasher.

**151.** Thrasher caused all of the harms noted in Count I thru X above.

## COUNT XI
## First Amendment Retaliation

**152.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 151.

**153.** In the alternative, Thrasher denied O'Hare's metal roof permit because O'Hare had exhibited dissidence towards one of the Town's employees, Ginsberg, when O'Hare called Ginsberg a "racist" and a "Barney Fife" in September, 2011.

**154.** Town Manager Thrasher caused all of the harms noted in Count XI.

## COUNT XII
### Illegal Seizer under the Fourth and Fourteenth Amendments

**155.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 154.

**156.** On or about November 22, 2011, Gorel illegally seized O'Hare and his trees when he ordered O'Hare to move the trees planted in the Right of Way of O'Hare's property.

**157.** O'Hare was seized without probable cause of a violation of law and/or with the intentions to retaliate against O'Hare for his dissidence stemming from speech and/or invidious spite.  The seizure of O'Hare was otherwise unreasonable in scope and duration when Gorel ordered Chris to personally remove the plants.

**158.** O'Hare suffered emotional distress, a deprivation of dignity, and was forced to personally undertake an extremely laborious task.

## COUNT XIII
### Conversion of Chattels or Trespass to Chattels

**159.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 158.

**160.** On or about November 21, 2011, Gorel intentionally and illegally exhibited domain over O'Hare's plants when he ordered O'Hare to move the plants on his property causing O'Hare time and labor to comply with Gorel's order and depriving O'Hare of his property interest in exclusive control of his chattels, and causing O'Hare emotional distress from Gorel's assault on O'Hare's dignity and all harms noted in Count XII.

## COUNT XIV
### Illegal Seizer under the Fourth and Fourteenth Amendments – Supervisory & Municipal Liability

**161.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 160.

**162.** Thrasher, the chief executive policymaker for the Town, had supervisory and municipal liability for Gorel's November 22, 2011 seizure of O'Hare and O'Hare's property because Thrasher was aware of Gorel's actions, they were in constant telephone contact, and Thrasher ratified Gorel's actions, affirmatively and by silence.

**163.** The Town's unwritten policy of planting in the right of way, through the Town Commission's 2004 discussion, caused Gorel to illegally search and seize O'Hare and his property without probable cause or reasonable suspicion of a violation of law.

**164.** O'Hare's harms are identical to those noted in Count XII.

## COUNT XV
### Denial of Equal Protection under the Fourteenth Amendment

**165.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 164.

**166.** Gorel, the Town, and Thrasher denied O'Hare equal protection when Gorel, under supervision of Thrasher, forced O'Hare to remove and transplant several trees, on November 21, 2011, under the Town custom of not allowing plants in the public right of way adjacent to O'Hare's property while allowing then Commissioner Anderson and other property owners to engage in the same behavior without action and, therefore, without a rational basis.

**167.** O'Hare suffered the same harms noted in Count XII.

## COUNT XVI
### Denial of Due Process under the Fourteenth Amendment

**168.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 167.

**169.** On or about May 30, 2012, the Town denied O'Hare's appeal of Thrasher's decision denying O'Hare's property interest in a metal roof because the Commission, sitting as the Board of Adjustment, was suspicious of the veracity of Engineer Lunn's certification. The Town denied O'Hare's permit for a metal roof, a property interest he was lawfully entitled to under the Town Code because of concern of fraud, without giving O'Hare a hearing to present evidence to allay any factual concerns that the Board may have had with Engineer Lunn's certification.

**170.** In the alternative, the Board pre-textually denied O'Hare's appeal with spite, insidious, or retaliatory motive in violation of equal protection.

**171.** The Town also did not meaningfully notice O'Hare that his Board of Adjustment Appeals would concern the legal or factual issues surrounding the impact of an engineer's report under the Town Code.

**172.** The aforementioned Board actions causing O'Hare to live without a completed roof, hurricane insurance and to undergo costly appeals and suffer emotional distress, anxiety from the numerous severe storms (including hurricanes and tropical storms) that frequent South Florida, and a basic enjoyment of life.

## COUNT XVII
## <u>Failure to Hire, Train & Supervise</u>

**173.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 172.

**174.** The Town, to this date, still has no procedural guidelines for Code Enforcement officers despite, during the most recent final budget hearing on September 17, 2013, Commissioner Ganger's request for the town to adopt code enforcement training or hire an outside agency for training.  To date, the commission failed to investigate code enforcement employee training.

**175.** The Town, acting with gross negligence, reckless disregard, and/or deliberate indifference to O'Hare's constitutional rights to property, liberty, speech, and equal protection under the Fourteenth Amendment of the Constitution, hired Thrasher, Ginsberg, Gorel, and Minor and failed to train same, or failed to supervise same, or failed to provide a standard code of conduct or procedural guide for same, and as a direct result Thrasher, Ginsberg, Gorel and Minor violated O'Hare's constitutional rights causing any and all harms in the aforementioned counts.

**176.** Thrasher, the chief executive policymaker for the Town, acting with deliberate indifference to constitutional rights, recklessly, trained, supervised, and/or hired Ginsberg and Gorel as the code enforcement officers, and Minor as the Town Planning Consultant, without the benefit of code enforcement guidelines.  As a direct result, O'Hare has suffered deprivations of constitutional rights and all of the aforementioned harms in any and all of the aforementioned counts.

**COUNT XVIII**
**Florida Negligent Hiring, Supervising, Training of Ginsberg, Gorel, Minor**
**and Thrasher**

**177.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 176.

**178.** Under Florida Statute 768.28, the Town, as an employer, negligently hired, trained, or supervised Thrasher in code enforcement actions, including his failure to designate O'Hare's home as an "Other/Various" style despite being so designated such under town Code 70-215, which caused O'Hare to be refused for his hurricane-rated garage door permit causing embarrassment, frustration, and emotional distress and potential damage from a future storm.

**179.** The Town's failure to train Thrasher caused him to negligently interpret the law and for O'Hare to be denied a metal roof, despite O'Hare's clear and unambiguous entitlement for that vested property interest, after the submission of an engineer's certification, under the Town Code, causing O'Hare to live without a completed weather-proof roof, to live with a leaking roof, to live without the ability to get hurricane insurance for over a year, as well as embarrassment, frustration, and emotional distress.

**180.** Thrasher negligently interpreted Town Code 70-32 "open front lawns" provision to carry the force of law, failed to recognize the term as unconstitutionally vague before enforcement, failed to determine a definitive and published interpretation, and therefore lacked probable cause before enforcement.  This caused O'Hare to undergo a hearing before Donlon, costing O'Hare legal fees, emotional distress, and frustration.

181. Under the same statute, Thrasher negligently trained or supervised Ginsberg in conducting code enforcement actions, and Minor as the Town Planning Consultant, which caused O'Hare emotional distress, harms to privacy, harms to dignity, embarrassment, and frustration.

182. Thrasher negligently trained or supervised Gorel and Minor when Thrasher consulted with Gorel and Minor about plantings in the right of way after Gorel's seizure of O'Hare, and consulted with Minor about Town Planning issues against O'Hare, causing O'Hare emotional distress, embarrassment, frustration, and the pains of labor.

183. The Town was negligent in failing to exercise reasonable care to consider the plane language of their own code when it caused O'Hare to undergo a code enforcement hearing without a neutral decision maker after failing to appoint Donlon per the requirements of the Town Code, causing O'Hare legal fees, emotional distress, frustration, and the lost profits stemming from the inability to attend to his business.

## COUNT XIX
## Denial of Due Process

184. Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 183.

185. Donlon denied O'Hare Due Process when she issued a vague order on April 2, 2013, demanding O'Hare open up his front lawn and to return it to its "preexisting condition" without specifying a particular date.  Although O'Hare attempted to comply with the vague order, he was forced to remove a good portion of his plants at a cost of thousands of dollars or face $100 a day fine.

186. The Town of Gulf Stream denied O'Hare Due Process when they prosecuted him in a code enforcement hearing without a neutral magistrate due to the fact that Donlon was unlawfully appointed and not a legally recognized Magistrate, thereby acting in clear absence of any jurisdiction.

187. The Town denied O'Hare Due Process when it enforced a false Order issued by Dolan who was unlawfully appointed and not a legal Magistrate, thereby acting in clear absence of any jurisdiction and thus creating false documents under the color of authority, thereby forcing O'Hare to take remedial action on his property or be fined.

188. The Town denied O'Hare Due Process when his property, both real and monetary, was placed in jeopardy under the "open front lawns" portion of the code without notice that the "open front lawns" portion carried the force of law and because the Town enforced an unconstitutionally vague law.

189. The Town denied O'Hare Due Process when his property, both real and monetary, was placed in jeopardy by Donlon, based solely upon Thrasher's falsified evidence concerning the consistent enforcement of open front lawns and the "grandfathering" of other properties presented at the Code Enforcement Hearing because Thrasher and prosecutor John Randolph knew this evidence was false prior to the hearing or knew subsequent to the hearing, and failed to correct it, which caused Donlon to enter judgment against O'Hare and for O'Hare to spend over $5,000 to bring his front lawn into conformance with that order, as well as emotional distress, time, and the pains of labor.

## COUNT XX
## Intentional Infliction of Emotional Distress

**190.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 189.

**191.** Thrasher and Minor intentionally misrepresented and misapplied code section 70-150 to incorrectly read that some plants were prohibited when the code correctly simply reads that these same plants are "typically found."

**192.** On or about March 5, 2012, Ginsberg intentionally used his position as a police officer to intimidate O'Hare by staring him down and banging on his front door, harassing him while O'Hare unloaded a trailer in his driveway, causing O'Hare emotional distress and to fear for his safety.


## COUNT XXI
## Slander

**193.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 192.

**194.** On or about March 5, 2012, Ginsberg maliciously told Gundlach to be careful and not to do what O'Hare said, and that the "Town had  O'Hare's number" – each false and defamatory statements – causing O'Hare to lose the confidence of his workers, negatively affecting his contractual relationship with them.

## COUNT XXII
## Malicious Prosecution/Abuse of Process

**195.** Plaintiff re-alleges and re-avers each of the allegations set forth in the above Paragraphs 1 through 194.

**196.** The Town, Minor, and Thrasher, the chief executive policy enforcer for the Town, in furtherance of retaliation or based upon animus, investigated, instigated, and otherwise participated in the prosecution of O'Hare on or about November 5, 2012, under the misuse of the Town Code Sec. 58-138(b), 70-150, and 70-146 without probable cause which were later dismissed by the April 2, 2013, order of Donlon, causing O'Hare to accrue legal fees and suffer emotional distress.


## Demand For Jury Trial

Plaintiff demands a trial by jury on all issued so triable.


WHEREFORE, Plaintiff demands judgment against Defendants in an amount within the jurisdictional limits of the court, to wit: in excess of Fifteen Thousand Dollars ($15,000), plus attorneys' fees, costs, roof repairs, punitive damages wherever applicable, and any other reasonable determinations this honorable court deems just and proper.  Plaintiff also demands any equitable remedies against Defendants, including Building Official for the City of Delray Beach, which is under an interlocal agreement with the Town of Gulf Stream to provide building inspection services for the Town but not limited to, rehearings wherever applicable, the imposition of procedural safeguards wherever

applicable for same, the imposition of federal oversight under the Fourteenth Amendment wherever applicable, and any other reasonable equitable or remedial actions this honorable court deems just and proper.

I HEREBY CERTIFY that a true & correct copy was furnished, via electronic filing, on October 16, 2013.

> ROBERT S. GERSHMAN, ESQUIRE
> 2160 W. Atlantic Avenue, 2d FL
> Delray Beach, FL 33445
> (561) 684-8898 (telephone)
> robert@rglawfirm.us
> s// Robert Gershman
> ROBERT S. GERSHMAN
> Florida Bar No. 917397